In re Clarence Joseph EBEL, Jr., Debtor.

Clarence Joseph Ebel, Jr., Plaintiff,

v.

Dennis King, Trustee, et al., Defendants.

Bankruptcy No. 90–10360 HRT.
Adversary No. 03–1443 HRT.

United States Bankruptcy Court,
D. Colorado.

April 28, 2005.

Clarence Joseph Ebel, Jr., Niwot, CO, pro se.

Philip D. Geil, Boulder, CO, for Debtor.

Douglas C. Pearce, II, Tom H. Connolly, Broomfield, CO, John William Barnett, Aurora, CO, L. Jay Labe, Denver, CO, for trustee.

## ORDER DENYING PLAINTIFF'S AMENDED COMPLAINT

HOWARD R. TALLMAN, Bankruptcy Judge.

This case comes before the Court on Plaintiff's Amended Complaint. By order dated September 22, 2004, trial of the Amended Complaint was bifurcated under FED. R. BANKR. P. 7042 and FED. R. CIV. P. 42(b). On December 15 and 16, 2004, the Court held a trial as to liability and damages with respect to Dennis King, Trustee. Trial of the Amended Complaint as to the remaining defendants Continental Casualty Co., Fireman's Insurance Co. of Newark, N.J., National Fire Insurance Co. of Hartford, National Fire Insurance Co. of Pittsburgh, Pa., Fireman's Fund Insurance Co., and Liberty Mutual Insurance Co. [the Insurance Company Defendants], has been held in abeyance pending the outcome of this initial trial.

Phillip D. Geil appeared at trial representing Plaintiff Clarence Joseph Ebel, Jr., and Douglas C. Pearce, II, appeared at trial representing Dennis King, Trustee. The Court has reviewed and considered all pleadings filed in this matter as well as evidence and argument presented at trial and is ready to rule.

### I. FACTS

This factual recitation necessarily includes only the relevant high points of the legal wrangling that has gone on for nearly twenty years in state court domestic proceedings and for the last fifteen years in the bankruptcy court.

1. In the parties' pre-trial statement, they were apparently able to agree on only the following three stipulated facts:

a. Debtor, together with his wife, Lois Ebel ["Mrs. Ebel"], owned and operated the Haystack Mountain Golf Course and Driving Range ["Haystack"] located in Boulder County, Colorado. On June 19, 1985, Mrs. Ebel filed for divorce in Boulder County District Court [the "State Court"]. On July 15, 1987, the State Court appointed a receiver to operate Haystack.

b. The State Court set a hearing in the divorce proceeding for March 26 and 27, 1990, which was suspended and later continued to June 12, 1990.

c. On June 8, 1990, Plaintiff filed the underlying chapter 7 bankruptcy case [the "Main Case"].

2. The Court finds the following additional facts from the evidence presented at trial and the Court's files.

a. On June 12, 1990, notwithstanding the filing of Mr. Ebel's bankruptcy petition, the State Court proceeded with its final orders hearing in the divorce case captioned *In re the Marriage of Lois Ebel and Clarence Ebel*, District Court, Boulder County, Colorado, Case No. 85 DR 1206 [the "Domestic Case"] and issued an opinion awarding all of the marital property to Mrs. Ebel on June 14, 1990.

b. Subsequently, in the Main Case, Mrs. Ebel applied for relief from the automatic stay and, on July 18, 1990, Bankruptcy Judge Donald Cordova, entered an order lifting the stay to allow the State Court to enter judgment on its June 14, 1990 order. Plaintiff did not appeal the bankruptcy court's order lifting the stay.

c. On August 10, 1990, the State Court entered judgment on its final orders. Plaintiff appealed the August 10, 1990, judgment to the Colorado Court of Appeals and on September 9, 1993, the State Court judgment was affirmed.

d. On February 20, 1991, Mrs. Ebel filed adversary number 91–1158 DEC in the bankruptcy court ["Mrs. Ebel's Adversary Case"] against Mr. Ebel and Dennis King [the "Trustee"] seeking an order compelling the defendants to render an accounting and turnover proceeds from operation of Haystack and other marital property.

e. In an order dated June 10, 1994, in Mrs. Ebel's Adversary Case, the bankruptcy court revisited its July 20, 1990, lift of stay order in the Main Case and held that it was void because the State Court proceedings took place in violation of the automatic stay. At the same time, the stay was lifted to allow the parties to return to the State Court and relitigate the property issues.

f. On August 9, 1994, the bankruptcy court vacated the June 10, 1994, order in Mrs. Ebel's Adversary Case. The effect of that vacatur was to reinstate its prior ruling which retroactively lifted the stay to validate the June 12, 1990, proceedings in the State Court. Both the Trustee and Mr. Ebel appealed the August 9, 1994, order to the U.S. District Court which affirmed Judge Cordova's ruling on March 26, 1996. That ruling was, in turn,

appealed to the Tenth Circuit Court of Appeals.

g. On July 30, 1997, the Tenth Circuit Court of Appeals rendered an opinion that addressed several issues raised by the bankruptcy court litigation. One of those issues was the validity of the domestic proceedings held on June 12, 1990, and the subsequent order and judgment emanating from those proceedings. The Tenth Circuit reversed and remanded. Among other things, the Tenth Circuit found that the State Court hearing was held in violation of the automatic stay and that the subsequent order dividing the marital property was void.

h. On December 8, 1997, partially in response to the Tenth Circuit decision, the bankruptcy court issued an order holding Mrs. Ebel's Adversary Case in abeyance and directing the parties return to State Court to relitigate the property division issues.

i. Upon retrial of the property issues, the State Court once again awarded the entire marital estate to Mrs. Ebel in a order dated December 9, 1999. That ruling was affirmed by the Colorado Court of Appeals on February 14, 2002, and Mr. Ebel's petition for *writ of certiorari* to the Colorado Supreme Court was denied on January 27, 2003. The State Court property division order is, therefore, final and no longer subject to appeal.

j. In the course of his administration of the bankruptcy estate, the Trustee received approximately $322,000.00, representing primarily proceeds and rents from the operation of Haystack.

k. On June 27, 1996, while Mrs. Ebel's Adversary Case was still pending, the Trustee entered into a settlement agreement with Mrs. Ebel for the estate to retain approximately $74,400.00 of those funds received by the Trustee and to turn the remaining funds over to Mrs. Ebel. Contemporaneously with the execution of that agreement, the Trustee turned the funds and property over to Mrs. Ebel and executed the associated releases.

l. On August 31, 2000, the Trustee filed his motion to approve that agreement. That motion also included a request that the court authorize abandonment of: 1) any interest in Haystack; 2) all funds received from the operation of Haystack other than the amount to be retained under the Trustee's agreement with Mrs. Ebel; 3) building lots in the Brigadoon Glen subdivision; 4) real property in Longmont, Colorado, known as 5877–5900 Niwot Road; 5) any interest in a land sale contract on real property located in Traverse City, Michigan; 6) any interest in a mobile home located in San Marcos, California; 7) two motor vehicles; and 8) a tort claim. Plaintiff filed an objection to the approval of that agreement and to the Trustee's proposed abandonment.

m. On March 26, 2004, Bankruptcy Judge A. Bruce Campbell held a hearing on the approval of the agreement with Mrs. Ebel and the Trustee's proposed abandon-

ment. On April 14, 2004, Judge Campbell issued his Order Granting Approval of Settlement Agreement and Overruling Objections to Abandonment of Property.[1]

## II. DISCUSSION

In many ways, this adversary proceeding represents a collateral attack upon various orders entered in the Plaintiff's Domestic Case, his bankruptcy case and related adversary actions. This Plaintiff has been *almost* uniformly unsuccessful in pursuing his various litigation positions both in the State Court and in his bankruptcy proceedings.[2] As an apparent last ditch, fall-back position, Plaintiff brings this action which seeks to establish that the Trustee has breached fiduciary duties owed to him. Plaintiff claims that the Trustee breached his fiduciary duties: 1) by his failure to collect and account for property received by the estate due to not properly collecting and accounting for the profits from the operation of Haystack and not collecting rent from Mrs. Ebel for her occupancy of the family residence; 2) by turning over marital property to Mrs. Ebel; and 3) by inadequately investigating the assets of the estate and failing to object to the IRS tax claim.

Plaintiff's problems in this case are manifold. As an initial matter, the Trustee has put Plaintiff's standing to bring these claims at issue.

### A. Standing

A chapter 7 bankruptcy trustee is the representative of the bankruptcy estate. 11 U.S.C. § 323(a). In his representative capacity, he may both sue and be sued. 11 U.S.C. § 323(b). The duties of a chapter 7 trustee include:

(1) collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest;

(2) be accountable for all property received;

(3) ensure that the debtor shall perform his intention as specified in section 521(2)(B) of this title;

(4) investigate the financial affairs of the debtor;

(5) if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper;

(6) if advisable, oppose the discharge of the debtor;

(7) unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest;

(8) if the business of the debtor is authorized to be operated, file with the court, with the United States trustee, and with any governmental unit charged with responsibility for collection or determination of any tax arising out of

---

**1.** The Court notes that, after the trial of this matter, on March 14, 2005, the U.S. District Court entered its final judgment affirming Judge Campbell's April 14, 2004, order.

**2.** The one bright and shining moment in Plaintiff's litigation history was the Tenth Circuit decision which had the effect of requiring that the State Court property division

proceeding be relitigated. It was a Pyrrhic victory because, upon retrial of the property issues, the State Court came to the same conclusion—that Mrs. Ebel should receive 100% of the marital property due to the Plaintiff's waste of marital assets in excess of the half to which he would have otherwise been entitled.

such operation, periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires; and

(9) make a final report and file a final account of the administration of the estate with the court and with the United States trustee.

11 U.S.C. § 704.

The Plaintiff complains that the Trustee failed to perform several of the duties enumerated above. There is certainly no question that the Trustee is charged with the performance of those duties which the Plaintiff claims he failed to perform. But the initial question is not whether the Trustee properly performed those duties; the initial question is whether or not this Plaintiff is entitled to enforce them. That is the question addressed by the standing issue.

*1) Applicable Standing Elements*

■ First of all, it is necessary to differentiate between the "person aggrieved" standard for standing which is applicable to bankruptcy appeals and the constitutional case or controversy standing by which this Court must measure its authority to adjudicate a matter. "The 'person aggrieved' test is meant to be a limitation on appellate standing in order to avoid 'endless appeals brought by a myriad of parties who are indirectly affected by every bankruptcy court order.' " *Lopez v. Behles (In re American Ready Mix, Inc.),* 14 F.3d 1497, 1500 (10th Cir.1994) (quoting *Holmes v. Silver Wings Aviation, Inc.,* 881 F.2d 939, 940 (10th Cir.1989)).

■ Under the "person aggrieved" standard, only those parties whose "rights or interests are directly and adversely affected pecuniarily by the decree or order of the bankruptcy court" are permitted to prosecute an appeal of that order. *Holmes,* 881 F.2d at 940. Thus, the "person aggrieved" test, which focuses on whether or not the appellant has been financially affected by a bankruptcy court order, is a prudential doctrine meant to limit bankruptcy appeals and sets a somewhat higher standard than the Article III cases or controversies standard that serves as a constitutional limitation on federal jurisdiction in the first instance. *Nintendo Co., Ltd. v. Patten (In re Alpex Computer Corp.),* 71 F.3d 353, 357 n. 6 (10th Cir.1995).

■ "Standing is an essential part of Article III's case-or-controversy requirement." *Utah Animal Rights Coalition v. Salt Lake City Corp.,* 371 F.3d 1248, 1255 (10th Cir.2004). Article III of the Constitution restricts federal jurisdiction to matters which present a case or controversy:

The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;-to all Cases affecting Ambassadors, other public Ministers and Consuls;-to all Cases of admiralty and maritime Jurisdiction;-to Controversies to which the United States shall be a Party;-to Controversies between two or more States;-between a State and Citizens of another State;-between Citizens of different States;-between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

U.S. CONST. art. III § 2, cl. 1.

■ The Supreme Court has explained that:

Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal citations omitted).

■ As the Supreme Court made clear in *Lujan*, standing is an evidentiary issue. Once the issue of standing was controverted by the Trustee, the burden was upon Mr. Ebel to offer evidence at trial that would demonstrate his standing. Mr. Ebel failed in that task.

### 2) Application of Standing Elements to the Amended Complaint

As *Lujan* states, the first standing issue is whether Mr. Ebel has suffered a genuine injury which is concrete, particularized and actual or imminent.

■ The First and Second Claims for Relief stated in the Amended Complaint focus on the operation of Haystack. Mr. Ebel alleges that the Trustee breached his fiduciary duties by his failure to require Mrs. Ebel to escrow half of the Haystack profits and account to the estate for those profits. Mr. Ebel also complains that the Trustee turned funds over to Mrs. Ebel pursuant to his settlement agreement with her before that agreement was approved by the Court.

Assuming the truth of the factual allegations made in those first two counts, Mr. Ebel has suffered no injury as a result of those actions. All of the property referred to in those counts is property which the State Court found to be property of Mrs. Ebel. Even if the Trustee would have taken all of the actions that Plaintiff suggests he should have taken, Plaintiff would have received no benefit, either direct or indirect from the Trustee's actions. The bankruptcy estate simply has no interest in those assets,[3] so they could not have been used to fund any surplus back to Mr. Ebel; nor could they have been used to pay down non-dischargeable tax debt for which Mr. Ebel is now responsible.

The Court finds that, at least with respect to the allegations made in the First and Second Claims for Relief in the

---

**3.** The Court takes Mr. Ebel's point that, at various times in this long and tortured process, the issues surrounding the adjudication of Mr. and Mrs. Ebel's respective property rights in the State Court have been subject to appeals filed in the state courts and in various levels of the federal court system. But that does not mean that the Trustee was not entitled to act upon the existing orders in the absence of a stay pending appeal. *See, e.g.,*

*Weatherford v. Bonney*, 2 F.3d 1161 (10th Cir. 1993). At the time of the Trustee's settlement with Mrs. Ebel, the existing orders supported the Trustee's conclusion that the estate had no interest in the marital property. After the Tenth Circuit's reversal of the order granting Mrs. Ebel relief from the automatic stay, until the State Court retried the property matters and came to the same conclusion, the Trustee took no new actions.

Amended Complaint, Mr. Ebel has stated no injury—not even hypothetical or conjectural—which he has suffered as a result of the Trustee's actions or failure to act. In the absence of any injury suffered by Mr. Ebel, the Court need not examine the remaining standing elements in connection with his First and Second Claims for Relief.[4] Mr. Ebel is without standing to bring those claims.

■ Mr. Ebel's Third Claim for Relief contains a potpourri of alleged breaches of the Trustee's fiduciary duties. First of all, Mr. Ebel charges that the Trustee breached his fiduciary duties "by willfully not objecting to Plaintiff's motion to lift the stay, causing the debtor to be charged in the State Court action with approximately $500,000 of attorney fees incurred by Lois Ebel from 1990 to 1997."

The Court is more than a little unclear on this allegation. Since Mr. Ebel is the Plaintiff in this present action, the Court assumes that the party that Mr. Ebel refers to as "Plaintiff" is Lois Ebel, the Petitioner in the Domestic Case. The only motion for relief from stay filed by Mrs. Ebel was filed in the Main Case on June 18, 1990, for the purpose of obtaining retroactive relief from stay to, in effect, ratify the State Court's previous proceedings in the Domestic Case. On June 20, 1990, the Trustee objected to that motion insofar as the motion sought enforcement of the State Court Decree and Order. The Trustee did not object to relief from the stay to allow that order to enter. On July 18,

1990, Judge Cordova lifted the stay solely for the purpose of allowing the State Court Decree and Order to enter.

While the Court accepts as true that Mr. Ebel has spent substantial sums in attorney fees to litigate the stay issue, he has not demonstrated the necessary causation between the Trustee's acquiescence to limited stay relief and his expenditure of attorney fees. There was, after all, an intervening third party. It was not the Trustee who lifted the stay; it was Judge Cordova, at Mrs. Ebel's request. The notice of hearing set the deadline for filing objections as July 11, 1990, and set July 18, 1990, as the hearing date. The Court has examined its file with respect to that hearing and finds: 1) that Mr. Ebel elected neither to file an objection to the motion prior to the applicable deadline nor to appear at the scheduled hearing; 2) that the court heard statements from the parties present; and 3) that Judge Cordova entered judgment lifting the stay on July 18, 1990, the day of the hearing. He followed up that judgment with a written order on July 20, 1990. For reasons known only to Mr. Ebel, he elected not to file a written objection to Mrs. Ebel's relief from stay motion until July 19, 1990, one day after the hearing was held and the judgment was entered. Despite Mr. Ebel's non-participation in the process, the motion was put at issue before Judge Cordova by the Trustee's filing of his objection. Judge Cordova considered the merits of the motion and found that cause existed for lifting the stay.[5] Mr. Ebel has

4. However, with respect to those remaining standing issues, even if the Court could find that Mr. Ebel had suffered some injury, the Court would be at a loss to find an causal connection between the Trustee's actions and any effect upon Mr. Ebel. The Trustee's actions were simply an appropriate response to State Court orders which awarded the marital

property to Mrs. Ebel. Furthermore, no decision from this Court could give Mr. Ebel favorable redress from those final and non-appealable State Court orders.

5. The Court also notes that Mr. Ebel never appealed the decision to modify the automatic stay. That order was addressed on numerous

not pointed this Court to any causal link between the Trustee's action and the fact that attorney fees were expended on protracted litigation following Judge Cordova's ruling. Consequently, Mr. Ebel has no standing to bring an action against the Trustee based on the nature of the Trustee's objection to Mrs. Ebel's June 18, 1990, motion for relief from stay.

■ Another of the allegations contained in the Plaintiff's Third Claim for Relief is stated as follows: "In addition, the Trustee earlier attempted to abandon the marital property in 1995 without having any concept of the value of the marital property." The Debtor has not alleged, let alone proven, any injury which he suffered as a result of the Trustee's *attempted* abandonment of marital property. Without an injury, this allegation fails to meet the first of the *Lujan* factors, therefore, Mr. Ebel lacks standing to bring this allegation.

■ Finally, Mr. Ebel charges that "The Trustee ... refused to investigate the IRS tax claims and to obtain a compromise, nor did he require that the compromised tax claim against Plaintiff, of $265,000, be paid by Lois Ebel as required by the Boulder District Court order of December 9, 1999."

That allegation appears to involve two complaints: first, that the Trustee failed to investigate the tax claim and engage in compromise discussions with the IRS relative to its claim against Mr. Ebel; and second, that the Trustee failed to enforce a State Court order requiring Mrs. Ebel to pay $265,000.00 to the IRS as a compromise of her tax liability.

The second of the two complaints lacks any factual basis as demonstrated by the Court's review of the State Court order to which Mr. Ebel refers. The State Court's December 9, 1999, Decree and Order states that "IRS now has a standing offer to compromise the entire tax debt for $265,000.00." In addition the State Court observed that "Because of Mr. Ebel's conduct, the marital property is now subject to over four million dollars in tax liens. The IRS has agreed to settle the tax debt for $265,000. Therefore, the marital property will be diminished by an amount not less than $265,000." The Decree and Order contains no directive whatsoever stating that Mrs. Ebel is to pay the referenced $265,000.00 compromise amount.[6] Thus, Mr. Ebel lacks standing to bring this allegation because he has again stated no injury. That Mrs. Ebel has been ordered to pay $265,000.00 by the State Court order is a fact that apparently exists only in Mr. Ebel's perception, it does not exist anywhere within the four corners of the document Mr. Ebel relies on. Even if there were some basis to believe that the Trus-

subsequent occasions in various collateral attacks but, again for reasons known only to Mr. Ebel, he ignored his right to take a direct appeal of the order. Such an appeal certainly would have been the most straight-forward, cost-effective method of resolving his concerns over the validity of that order.

**6.** The State Court appears to be engaging in the reasonable assumption that the IRS tax lien will follow the marital property and that Mrs. Ebel may elect to pay the IRS $265,000.00 as a compromise of her liability

rather than allow the IRS to move forward with a seizure of property that is subject to its lien. That is the very most that this Court can make of the State Court's comment with respect to a $265,000.00 compromise of the tax debt. Those comments appear in the discussion section of the State Court's Decree and Order. By contrast, the section containing the State Court's actual orders is devoid of any reference to that $265,000.00 tax claim compromise amount.

tee had a duty to seek enforcement of a State Court order having no bearing on the affairs of the bankruptcy estate,[7] Mr. Ebel could not have been injured by the Trustee's failure to enforce a non-existent order.

Finally, as to the remaining allegation of the Third Claim for Relief with respect to the Trustee's supposed breach of duty to investigate and compromise Mr. Ebel's tax controversy with the IRS, Mr. Ebel cannot maintain standing to pursue that allegation by claiming an injury to a non-existent right. *State of Utah v. Babbitt*, 137 F.3d 1193, 1207 (10th Cir.1998) (citing *Claybrook v. Slater*, 111 F.3d 904, 907 (D.C.Cir. 1997); *Arjay Assocs., Inc. v. Bush*, 891 F.2d 894, 898 (Fed.Cir.1989)).

The IRS filed a claim (# 4) in the amount of $407,695.26. That claim is presumed allowed. 11 U.S.C. § 502. The IRS claim is dated on August 1, 1990. The Debtor himself filed a proof of claim (# 7) on behalf of the IRS on December 13, 1990.

The Debtor's proof of claim stated that the IRS asserts a total claim in the amount of $938,809.38. According to the Debtor's version, the IRS claim consists of its original filed claim in the amount of $407,695.26 plus "[a]dditional proposed deficiency of income tax as shown on the letter and accompanying documents dated September 19, 1990, form Letter 1384." The amounts shown on that letter add up to $194,819.00. Lastly, the Debtor states that the IRS is also claiming an "[a]dditional proposed deficiency of Employment Tax, assessed against Haystack Mountain Golf Course."

The Debtor does not specify the amount of the employment tax deficiency, but the total amount of the proof of claim, less the original IRS claim amount and the additional proposed deficiency of income tax, leaves $336,295.12 which is attributable to the Haystack employment tax deficiency. Significantly, the Debtor states that "[t]he undersigned believes that the amount attributed to the proposed deficiency of Haystack Mountain Golf Course, Employment Tax forms 941 and 940 are in dispute." The clear implication of that statement is that the original IRS claim amount and the additional income tax deficiency are not disputed. According to Mr. Ebel, "[t]his claim is entitled to priority status under section 507(a)(6) [now § 507(a)(8) ] of the Bankruptcy Code."

 The duty to investigate and enter into compromise negotiations with a creditor filing a proof of claim is not specifically enumerated under § 704. However, investigation of the factual basis underlying a claim and working toward disallowance or compromise of the claim are part of the Trustee's duty to object to an improper claim under § 704(5). Under that subsection, the Trustee has a duty *"if a purpose would be served,* [to] examine proofs of claim and object to the allowance of any claim *that is improper."* 11 U.S.C. § 704(5) (emphasis added). Thus, the Code imposes two important qualifiers on the Trustee's duty to object to a proof of claim. The claim must be improper and, even if it is improper, the Trustee is under no duty to object in the absence of a proper purpose to do so. The apparent

---

**7.** Even if the Court could interpret the State Court Decree and Order in the way that Mr. Ebel does, it is not at all clear why the topic of whether or not Mrs. Ebel settles her liability with the IRS from property in which the estate has no interest would be a matter of concern to the Trustee with respect to his fiduciary responsibilities to the bankruptcy estate.

purpose which the Debtor wants the Trustee to serve is to reduce the Debtor's overall tax obligation so that the tax owed by the Debtor post-bankruptcy will be reduced. But the Court does not read the language of § 704(5) to suggest that a proper purpose for examination of, and objection to, a claim is to make the Debtor's life easier after his bankruptcy case is concluded. The focus of the Trustee's duties is the collection and distribution of estate assets for the benefit of creditors. *In re Balco Equities Ltd., Inc.,* 323 B.R. 85, 97 (Bankr.S.D.N.Y.2005) (citing *In re Poage,* 92 B.R. 659, 662 (Bankr.N.D.Tex. 1988)) ("Although a Chapter 7 trustee is a fiduciary obligated to treat all parties fairly, his primary duty is to the estate's unsecured creditors."); *In re Ngan Gung Rest.,* 254 B.R. 566, 570 (Bankr.S.D.N.Y.2000) ("A trustee has the statutory duty to protect and preserve property of the estate for the purpose of maximizing a distribution to creditors."). The purpose to be served, therefore, must relate to the Trustee's duty to the creditors to collect and distribute assets. It cannot be a proper purpose for the Trustee to expend estate assets objecting to a proof of claim if no benefit would otherwise accrue to the remaining creditors of the estate.

Moreover, the Court has seen no evidence to the effect that the IRS claim is improper. Indeed, the Debtor's own version of the amount owed to the IRS not only includes the original $407,695.26 reflected on the IRS filed claim, it adds a minimum of $194,819.00 of additional income tax liability to that amount.

Thus, the evidence discloses that neither of the predicates to the Trustee's duty to object to a claim are present here. There is no evidence either that the IRS claim is improper or that a proper purpose would

be served by pursuing an objection to that claim. Since the Trustee has no duty to object to the IRS claim, the Debtor lacks standing to complain about the Trustee's failure to perform such duty.

In accordance with the above discussion, the Debtor lacks standing to pursue any of the three Claims for Relief enumerated in the Amended Complaint. Therefore, the relief prayed for in the Amended Complaint must be denied.

## B. Lack of Fiduciary Duty

The question of whether or not the Trustee owed Mr. Ebel a fiduciary duty goes to the merits of the Amended Complaint. Each of the causes of action in the Amended Complaint charges the Trustee with a breach of fiduciary duty. A chapter 7 trustee is, of course, a fiduciary.

> But to say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obligations? And what are the consequences of his deviation from duty?

*SEC v. Chenery Corp.,* 318 U.S. 80, 85–86, 63 S.Ct. 454, 458, 87 L.Ed. 626 (1943) (Justice Frankfurter).

The first of the above questions—to whom is the Trustee a fiduciary?—creates the problem for Mr. Ebel in this matter. The Trustee is indeed a fiduciary but, under the facts of this case, the Trustee owes no fiduciary duties to Mr. Ebel.

This bankruptcy estate is hopelessly insolvent. The Court's review of Plaintiff's bankruptcy schedules reveals that all of the real property listed in his schedules is marital property. The evidence that was

adduced at trial makes it quite clear that the estate has no interest in the marital property owned by the Plaintiff and Mrs. Ebel at the time of their divorce in 1985. The only personal property listed by Plaintiff that has anything but *de minimis* value is an asserted tort claim against the law firm of Chrisman, Bynum and Johnson, P.C. The asserted value of that claim was $3,000,000.00.

The Trustee investigated the claim and determined that it held no value for the estate. Consequently, the Trustee made application to the Court to abandon that claim. The court docket reveals that Mr. Ebel received notice of the proposed abandonment and lodged an objection. After a hearing on the merits of the Trustee's abandonment notice, Judge Campbell allowed the claim to be abandoned by the estate. The only other property scheduled by the Plaintiff was the remaining personal property which he valued at $10,000.00.

Much of that remaining $10,000.00 worth of property was marital property in which the estate has no interest. The remainder has been abandoned by the Trustee. That leaves the $74,400.00, received by the Trustee from his settlement with Mrs. Ebel, as the sole asset of this bankruptcy estate. By contrast, there have been unsecured claims filed in the case that total at least $545,595.61.[8]

Because the estate lacks the potential to generate any surplus that would be distributed back to Mr. Ebel, the Court finds that he is not a party in interest with respect to matters of estate administration. *60 East 80th Street Equities, Inc. v. Sapir (In re 60 East 80th Street Equities, Inc.)*, 218 F.3d 109, 115 (2nd Cir.2000); *Richman v. First Woman's Bank (In re Richman)*, 104 F.3d 654, 658 (4th Cir. 1997). In those rare cases where a chapter 7 bankruptcy trustee owes a fiduciary duty to a chapter 7 debtor, that duty is triggered by the debtor's status as a party in interest as to the assets of a surplus estate. *See, e.g., George Schumann Tire and Battery Co., Inc. v. Grant (In re George Schumann Tire and Battery Co., Inc.)*, 145 B.R. 104, 107 (Bankr.M.D.Fla. 1992). In this case, however, Mr. Ebel lacks any conceivable interest in the administration of bankruptcy estate assets and, accordingly, he lacks any basis to claim that the Trustee owes him a fiduciary duty.

Even if Mr. Ebel had standing to pursue the claims alleged in his Amended Complaint, on the merits of the Amended Complaint, the evidence establishes that the Trustee owes Mr. Ebel no fiduciary duty. Because each and every Claim for Relief enumerated in the Amended Complaint is based on an allegation of the Trustee's breach of fiduciary duty, and because Mr. Ebel has been unable to establish the fiduciary duties upon which each of his Claims for Relief is based, all relief prayed for in the Amended Complaint must be denied.

## C. Trustee Liability under Sherr v. Winkler

■■■■■ Even if Mr. Ebel had standing to pursue these causes of action; even if

---

**8.** This total was derived by the Court from a cursory review of the claims filed in the case. Secured claims and those that appeared to be amended or replaced by later filed claims were not counted. The Court also disregarded the claim filed by Mr. Ebel on behalf of the IRS because the IRS had previously filed its own claim. This calculation was done only for the purpose of analyzing the apparent solvency or insolvency of the estate and does not constitute an allowance or disallowance of any filed claim.

the Trustee owed Mr. Ebel a fiduciary duty, in the Tenth Circuit, the case of *Sherr v. Winkler*, 552 F.2d 1367 (10th Cir. 1977), controls when a bankruptcy trustee may be found personally liable for a breach of duty. The matter is not without controversy and disagreement amount the circuits, *see LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 7 (1st Cir.1999); but, in this circuit, *Sherr* holds that "a trustee or receiver in bankruptcy is (a) not liable, in any manner, for mistake in judgment where discretion is allowed, (b) liable personally only for acts determined to be willful and deliberate in violation of his duties and (c) liable, in his official capacity, for acts of negligence." *Sherr v. Winkler*, 552 F.2d 1367, 1375 (10th Cir.1977) (citing *Mosser v. Darrow*, 341 U.S. 267, 272, 71 S.Ct. 680, 682, 95 L.Ed. 927 (1951)). The *Sherr* court went on to explain that

> a trustee in bankruptcy is not [to] be held personally liable unless he acts willfully and deliberately in violation of his fiduciary duties. A trustee in bankruptcy may be held liable in his official capacity and thus surcharged if he fails to exercise that degree of care required of an ordinarily prudent person serving in such capacity, taking into consideration the discretion allowed.

*Sherr*, 552 F.2d at 1375.

Mr. Ebel does not seek to hold the Trustee liable in his official capacity and to collect damages from the estate. Mr. Ebel believes that he is entitled to collect damages of: 1) his liability for attorney fees of approximately $500,000.00; 2) $265,000.00 to fund a tax compromise with IRS; 3) approximately $290,000.00 of profits from Haystack; 4) $100,500.00 rent for the golf course residence; 5) attorney fees for the current action; and 6) punitive damages.

The $74,400.00 being held by the estate would hardly make a dent in the damages to which Mr. Ebel believes he is entitled, so an assessment of personal liability against the Trustee would be essential to Mr. Ebel's recovery of the damages which he seeks. It also brings Mr. Ebel's claims against the Trustee squarely within the ambit of *Sherr v. Winkler*.

■ The Court will observe that the Trustee's actions in this case are not totally beyond reproach. Specifically, the Court would have much preferred it if the Trustee would not have performed his agreement with Mrs. Ebel until after obtaining court approval. Nonetheless, Judge Campbell found the settlement to be in the best interests of the estate and did give it his approval after a full and fair hearing of Mr. Ebel's objections to the deal. Consequently, even the one action on the Trustee's part that this Court finds somewhat questionable hardly gives Mr. Ebel any basis to claim that he was damaged by that action. In fact, as to the merits of the settlement itself, the Court is impressed with the Trustee's negotiation skills. It is likely that Mrs. Ebel would have prevailed if she had taken the position that the estate was not entitled to a dime of the money that the Trustee collected.

As to the standard for trustee liability in this circuit, Mr. Ebel's evidence at trial fell far short of demonstrating the willful and deliberate conduct that it was Mr. Ebel's burden to prove in order to prevail on his claim of personal liability against the Trustee. The evidence fell short of proving any negligence on the part of the Trustee, let alone willful and deliberate conduct.

### D. Derived Judicial Immunity

The First and Second Claims for Relief in the Amended Complaint allege that the

Trustee breached his fiduciary duty: 1) by his failure to collect and account for property received by the estate because he did not properly collect profits from the operation of Haystack or collect rent from Mrs. Ebel for her occupancy of the family residence; and 2) by turning over marital property to Mrs. Ebel. Both of these causes of action center upon ownership of the marital assets. That was, of course, the subject of litigation in the State Court Domestic Case as well as the subject of the Trustee's settlement with Mrs. Ebel. The Trustee sought approval of his settlement with Mrs. Ebel from the bankruptcy court and on April 14, 2004, Judge Campbell granted that approval.

It is well settled that a trustee who acts pursuant to court orders, after full disclosure to the court, is cloaked in the mantle of derived judicial immunity. *See, e.g., Mosser v. Darrow,* 341 U.S. 267, 274, 71 S.Ct. 680, 683, 95 L.Ed. 927 (1951); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)* 196 F.3d 1, 8 (1st Cir.1999); *Yadkin Valley Bank & Trust Co. v. McGee,* 819 F.2d 74, 76 (4th Cir. 1987); *Lonneker Farms, Inc. v. Klobucher,* 804 F.2d 1096, 1097 (9th Cir.1986); *Boullion v. McClanahan,* 639 F.2d 213, 214 (5th Cir.1968). The Court finds that the Trustee sought and received court approval of all of the actions complained of in Mr. Ebel's First and Second Claims for Relief. The Court heard no credible evidence to the effect that the Trustee did not fully disclose the facts and circumstances surrounding his settlement with Mrs. Ebel to the court which approved the settlement. Moreover, Mr. Ebel objected to the settlement and received a full and fair hearing of his objection. Consequently, at least as to the allegations stated in Mr. Ebel's First and Second Claims for Relief, the Court finds that the Trustee is immune from suit.

The allegations of improper action or inaction by the Trustee, contained in the Third Claim for Relief, did not involve situations where the Trustee would be required to obtain court permission. Therefore, because the Court's previous analysis of these claims indicates the Trustee was not required to address such matters in judicial proceedings, derived judicial immunity is inapplicable to the Third Claim for Relief.

### III. CONCLUSION

The Court found Mr. Ebel's demeanor on the witness stand to be a bit of a contrast to the impression that one gets from reviewing the voluminous pleadings in the various cases in which he has been involved. Mr. Ebel was unfailingly courteous and deferential to the Court and the Court has no reason to doubt his sincerity or the veracity of his testimony. Nonetheless, it does appear that, as Judge Campbell observed, "Mr. Ebel's appetite for litigation in this bankruptcy is nothing short of insatiable." *In re Ebel,* No. 90–10360 n. 1 (Bankr.D.Colo. filed April 14, 2004). Indeed, the bankruptcy court's association with Mr. Ebel is now in its fifteenth year. Therefore, the Court believes that it is appropriate to provide some perspective to the alleged wrongs for which Mr. Ebel has sought redress in this action.

The Court will start with the observation that the whole tenor of Mr. Ebel's Amended Complaint appears to be based upon a profound misunderstanding of how bankruptcy law operates generally; the scope of a bankruptcy trustee's legitimate concerns in particular; and the deference that federal courts owe to the state courts in the areas of their specialized expertise.

An overview of this fifteen year old bankruptcy case presents the appearance of a gentleman who has attempted to enlist the good offices of the bankruptcy court and the bankruptcy trustee to aid him in his battles with taxing authorities and his former spouse.

It seems that, some years ago, Mr. Ebel adopted a somewhat unorthodox view of a citizen's relationship to his government that caused him to believe that the U.S. Constitution supported his distaste for the payment of income taxes. He subsequently ceased payment of such taxes and came into some conflict with the Internal Revenue Service.

In addition to his issues with the IRS, problems also arose in Mr. Ebel's domestic life which led Mrs. Ebel to petition the state courts for a dissolution of the marriage. The Court can certainly understand how an individual who is beset by personal and legal challenges on multiple fronts may come to feel that he is under siege, but what baffles the Court is how Mr. Ebel apparently came to view the federal bankruptcy system as the white knight that would ride to his rescue.

Simplified to its absolute most basic level, a bankruptcy filing under chapter 7 represents an agreement that a debtor makes to give up all of his non-exempt property to be liquidated and distributed by the bankruptcy trustee in return for relief from his dischargeable debts. The relationship between a debtor and the bankruptcy trustee requires a fair amount of cooperation on the debtor's part to clarify information, turn over property and supply records and documents when necessary. It is also a relationship that contains a potential for conflict because disagreement can arise between a debtor and a trustee concerning a debtor's interests in certain property and whether or not property is available for administration in the bankruptcy estate. That is not to say that the debtor's interests may not coincide with the estate's interests at times. Certainly, in the rare situation where the debtor turns over sufficient property to the trustee to pay all claims and administrative expenses of the estate, the debtor's interest in receiving the surplus coincides with the trustee's duty to safeguard estate assets. But, it is reasonable to observe that the interests of a debtor and the interests of the bankruptcy estate, represented by the bankruptcy trustee, are very different at times and, on occasion, those interests are in direct conflict. As a consequence, it is illogical to view a bankruptcy trustee as one whose role requires advocacy of the debtor's interests.

The Court sees nothing in the relationship between a debtor and a trustee, or the relationship of the debtor to the bankruptcy court, that should have suggested to Mr. Ebel that either one may be used as an active ally in his fights with the IRS or with his former spouse. A bankruptcy trustee is primarily responsible to the creditors to expeditiously and cost-effectively liquidate and distribute property to creditors. It is only in rare instances that a duty is owed to the debtor. When such a duty is owed, it typically centers on the trustee's responsibility to safeguard surplus property that will be returned to the debtor. Here, there is no surplus because the courts have ruled that the Trustee has no interest in the marital property. A court, of course, takes the side of no litigant against another, but must serve as an impartial arbiter of the disputes which arise. One role that federal courts never take on, in the absence of a valid basis of federal jurisdiction, is that of

a court of appeals for state court determinations.

Nonetheless, it appears to this Court that the primary focus of Mr. Ebel's efforts during the course of his bankruptcy case has been an attempt to enlist the aid of the bankruptcy court in reviewing and modifying state court orders and to enlist the aid of the bankruptcy trustee to take on his fight with the IRS and his former spouse. In particular, much of the relief prayed for in the current Amended Complaint would have this Court exact a penalty against the Trustee for failing to spend the scant resources of the bankruptcy estate in order to function as the Debtor's advocate before the IRS, as well as for failing to fight Mrs. Ebel in order to keep her from concluding the state court domestic case that was begun years before the bankruptcy was filed.

In addition, the domestic litigation at issue is an area in which the state courts possess particularized expertise in the adjudication of those state law domestic issues, which is lacking in the bankruptcy court. Even if a bankruptcy court possessed the jurisdiction to wade into those murky waters, it is hard to imagine why it would do so. That is especially true for a case such as this one where, before a petition in bankruptcy was filed, domestic proceedings had been ongoing in the state court system for five years and those proceedings were one hearing away from being concluded.

In accordance with the above discussion, the Court will deny all relief prayed for against the Trustee. The remaining defendants in the case are all insurance companies for whom any liability to the Plaintiff would be derivative of the Trustee's liability. The Court's decision herein has rendered the Amended Complaint moot with regard to those Insurance Company Defendants. Therefore, the Court will dismiss this action against those defendants as well. It is, therefore

**ORDERED** that the Court hereby DENIES all relief prayed for in the Amended Complaint against the Trustee and will enter judgment in his favor. It is further

**ORDERED** that judgment will enter in favor of the Insurance Company Defendants. The Amended Complaint is DISMISSED as to Continental Casualty Co., Fireman's Insurance Co. of Newark, N.J., National Fire Insurance Co. of Hartford, National Fire Insurance Co. of Pittsburgh, Pa., Fireman's Fund Insurance Co., and Liberty Mutual Insurance Co. on the basis of mootness.